Ray E. McCurdy v. Commissioner.
Ray E. McCurdy v. Commissioner
Docket No. 17833.
United States Tax Court
1950 Tax Ct. Memo LEXIS 35; 9 T.C.M. (CCH) 1073; T.C.M. (RIA) 50287; November 24, 1950
Oliver A. Wyman, Esq., for the petitioner. William C. W. Haynes, Esq., for the respondent. RAUM
Memorandum Findings *36 of Fact and Opinion RAUM, Judge: The petitioner seeks a redetermination of a deficiency in income tax for the calendar year 1944 in the amount of $9,405.30, consisting of the deficiency originally asserted in the amount of $7,574.60, plus an increased deficiency, for which claim was subsequently made by the respondent. The principal issue is whether the petitioner was a bona fide resident of Russia during the entire calendar year 1944, and, therefore, entitled to an exemption from tax under Section 116(a)(1) of the Internal Revenue Code with respect to earnings received during that year. Two subsidiary issues were raised by respondent relating to the taxability of amounts received by petitioner from the Russian government in its currency and to the inclusion in his gross income of certain life insurance premiums paid by his employer. These issues have apparently been conceded by petitioner as in a supplemental stipulation the parties agree that, if the principal issue is decided in favor of the respondent, the deficiency in tax for the calendar year 1944 shall be redetermined to be the amount of $9,405.30. The case was submitted upon a stipulation of *37 facts and oral testimony taken by deposition, and the findings below are based in part upon such testimony. Findings of Fact The stipulated facts are so found. The petitioner is an individual, who filed his income tax return for the year 1944 with the collector of internal revenue for the district of Massachusetts. Petitioner has been employed since 1938 by E. B. Badger & Sons Co., a Massachusetts corporation having its usual place of business in Boston, Mass. Its business is the designing, engineering and construction of oil and chemical plants. It will hereinafter be referred to as the company. Under date of January 28, 1943, a contract was executed between the United States Government and the company covering architectural and engineering services to be rendered in connection with the construction of certain petroleum refineries in Russia under the Lend-Lease program. The contract, among other things, provided that the company prepare working drawings and specifications of oil refining plants and process units; procure on behalf of the United States Government material and equipment necessary for the construction of such plants and units; furnish qualified engineers to *38 travel to and remain in Russia for such period of time as would be necessary, in the opinion of the United States Government, for the purpose of giving advice in connection with the construction operations; and train Russian engineers to operate the facilities. The company's responsibility in connection with the construction work was limited to general advisory and consulting functions. If conditions arose which, in the opinion of the Government, made it advisable or necessary in the interests of national welfare to cease work under the contract, provision was made for its termination by the Government by giving written notice to the company. The project covered by the Government contract was emergency war work. It was principally for the production of aviation gasoline and aviation lubricating oil. Although the contract was general in its terms, it contemplated specific installations, and set forth both an estimated cost for the project as a whole, as well as compensation by the way of a fixed fee for the company. Upon completion of that project its responsibilities in Russia were to be at an end. On July 6, 1943, the United States Government and the U.S.S.R. entered into an agreement *39 hereafter called The Russian Agreement, "in order to provide a satisfactory basis under which engineers and technicians from the United States of America may perform duties within the U.S.S.R. in connection with the installation of projects transferred to the U.S.S.R. under the terms of the Act of March 11, 1941 (Lend-Lease Act)". The agreement contained the following provisions: "1. Engineers and technicians assigned to the installation of projects above mentioned shall be attached to the United States Supply Mission in the U.S.S.R., which shall be responsible for the said engineers and technicians, and the Chief of which Supply Mission shall have complete authority, subject only to the control of the Chief of the Diplomatic Mission of the United States in the U.S.S.R., to represent them and the Lend-Lease Administration of the United States Government before the responsible individuals and agencies of the Government of the U.S.S.R. "2. Any or all said engineers and technicians may be recalled to the United States, with or without replacement, upon the request of the company employing them, upon the request of the Chief of the United States Supply Mission in the U.S.S.R., or *40 upon the request of the responsible individuals or agencies of the Government of the U.S.S.R. filed with the Chief of the United States Supply Mission in the U.S.S.R. If any of said engineers and technicians are recalled in accordance with the provisions of this section, they shall be replaced, if possible, upon the request of the Government Purchasing Commission of the U.S.S.R. filed with the Office of Lend-Lease Administration. "3. Proper credentials shall be provided without charge by civilian and military authorities of the U.S.S.R. to permit presence in the U.S.S.R., travel in performance of duties and departure from the U.S.S.R. Said engineers and technicians shall be subject to the local factory and office regulations in force at their place of work. "4. Said engineers and technicians shall be permitted to bring with them to the U.S.S.R., or obtain subsequently from abroad free of customs' duties, personal and household effects for their personal and professional use, including typewriters, phonographs, records, radios, tools, engineering instruments, technical books and drawings, office supplies and other equipment for personal entertainment or required in the performance *41 of their duties provided that the use of said items does not conflict with the law and regulations of the U.S.S.R. in force during war time. Permission shall also be given to said engineers and technicians by proper Soviet authorities to take with them free of charge on departure, or send subsequently to the United States, such effects without restriction. "5. Said engineers and technicians shall be specially authorized to import into the U.S.S.R. and use short wave radio receivers so that they may follow news from abroad. "6. Said engineers and technicians shall be provided, at the expense of the U.S.S.R., first-class transportation for themselves and their belongings from the United States to the point of destination in the U.S.S.R. and return, as well as first-class transportation within the U.S.S.R., this transportation to be by steamer, railway, and if possible, by plane. Local transportation to and from daily work shall be provided at the expense of the U.S.S.R., if possible, by automobile. "7. Said engineers and technicians shall be provided, at the expense of the U.S.S.R., suitable separate apartments or houses with all possible facilities for their comfort, including *42 light, heat, plumbing and water supply, as well as qualified servants and interpreters. "8. Said engineers and technicians shall be provided by the responsible Soviet authorities with suitable ration cards or food norms to permit them to purchase food and other necessities for cash while in the U.S.S.R. "9. Said engineers and technicians shall be provided with suitable medical care and hospital facilities at the expense of the U.S.S.R. "10. The U.S.S.R. shall pay monthly to each engineer, or to his designated agent within the U.S.S.R., 2,500 roubles over and above income taxes or other taxes, said sum to be paid in advance on arrival and monthly thereafter, until departure from the U.S.S.R., to cover personal and incidental expenses. Should this payment prove inadequate to meet the needs specified, a higher payment shall be negotiated by the Chief of the United States Supply Mission in the U.S.S.R., and responsible agencies of the government of the U.S.S.R. "11. The Chief of the Diplomatic Mission of the United States in the U.S.S.R. retains in relation to said engineers and technicians his basic responsibility for the protection and welfare of United States citizens in *43 the U.S.S.R." By Amendment No. 2 to the Government Contract, dated July 29, 1943, it was provided that the engineers should be entitled to all the benefits and subject to all of the restrictions provided for in the Russian Agreement. The petitioner was familiar with the Russian Agreement and knew that it was made a part of the Government Contract by amendment. Under date of September 15, 1943, the petitioner executed a contract of employment with the company. The contract of employment was for service in the U.S.S.R. pursuant to the Government Contract and the Russian Agreement. The contract of employment provided that the petitioner was employed "for an indefinite period beginning June 20, 1943, for service with the Company in the U.S.S.R., to perform such duties and for such hours as may be assigned to him during the term of his employment, provided, however, that this employment is at will and may be terminated, with or without cause, and without notice * * *"; that his salary would be paid in U.S. currency; that deduction would be made for social security, victory tax, income tax, and other taxes as required by United States law; and that the company would pay all traveling *44 expenses from petitioner's home to the point of embarkation and to and from the U.S.S.R. In the contract of employment the company also agreed to furnish life insurance, including war risk on the life of petitioner in the amount of $10,000 which was to be payable to any beneficiary named by him; special foods and rations; utensils and facilities for handling, preservation and cooking of foods; medical and sanitary supplies; special clothing and bedding; short wave radios; and engineering office supplies. It was originally estimated that the work in Russia, covered by the Government Contract and the contract of employment, would take from eighteen to twenty-four months. Because of additions to the refineries authorized in 1944 it took approximately a year longer than was originally estimated to complete the project. Petitioner embarked for Russia September 22, 1943, and on his arrival in the U.S.S.R. he pursued his duties as resident manager of the Russian project. He was in Russia, or en route therefrom, continuously from the time of his arrival in that country until May 6, 1946, with the sole exception of a trip of some six or seven weeks to the United States in the spring of *45 1945, taken for purposes of consultation in connection with the Russian project. Petitioner had no intention of becoming a permanent resident of the U.S.S.R. when he left the United States. He was a married man at that time, and his family consisted of a wife, a daughter, and two sons. Before leaving the United States in 1943, he purchased a home in Farmington, Michigan, for his wife and daughter to live in while he was in Russia. Prior to 1943, he did not own a home. In his personal history form, which he filled out in connection with the contract of employment, he gave Farmington, Michigan, as his permanent address. Petitioner instructed the company to deposit $325 of his salary in the State Bank of Farmington, Michigan, where he and his wife had a joint account; to purchase war bonds in the amount of $300 per month from his salary and have them issued to himself and his wife and sent to his wife in Farmington, Michigan; and to deposit the remainder of his monthly salary in a joint account which he and his wife had in the First National Bank of Boston. The company carried out these instructions. From the date of his arrival in the U.S.S.R. in 1943 until January 1945 petitioner *46 lived in the Savoy Hotel. Thereafter, he lived in an apartment. The hotel was in Moscow and was operated by Intourist, a Soviet government agency dealing with tourists and traveling people. It was a hotel primarily for transients, although he testified that he did not regard himself as a transient. Petitioner's participation in the social life of the U.S.S.R. involved attending parties given by the Russians at the time of the arrival at or departure from the refineries of engineers assigned thereto. He also attended some parties in Moscow given by the Russians and some at the American Embassy. Petitioner received from the U.S.S.R. 2,500 rubles per month, or a total of 30,000 rubles during the calendar year 1944, in accordance with the terms of the Russian Agreement, the Government Contract and the contract of employment. The value of the 30,000 rubles received by petitioner in 1944 was $2,500 in American money. The Russian currency thus paid to the petitioner was intended to cover his personal and incidental expenses while in the U.S.S.R. working on the project, and there were no restrictions on the way that he could spend it. Pursuant to the contract of employment, petitioner's *47 employer, the company, purchased a life insurance policy in the amount of $10,000 on the life of the petitioner. This policy was payable to the petitioner's wife in the event of his death during the term of his employment with the company as set forth in the contract of employment. The company paid during 1944 premiums on this policy of insurance in an amount of $594.50. No part of this payment of premiums by the company was deducted from the petitioner's salary. When petitioner returned to the United States at the completion of his work in the U.S.S.R. in May 1946, he returned to his home in Farmington, Michigan, where his family had lived during his absence. The company filed with the Bureau of Internal Revenue a withholding statement, Form W-2b, in which it reported it had paid petitioner wages of $19,750 during the year 1944, and that no Federal income tax had been withheld. The petitioner did not include this amount in his taxable income in his return for the year 1944, and stated therein that he was a resident of Russia during the entire year. Opinion Petitioner seeks exemption from tax on income earned by him in Russia during the year 1944. The controversy turns upon *48 Section 116 (a) (1) of the Internal Revenue Code, as amended by Section 148(a) of the Revenue Act of 1942, which provides: "In addition to the items specified in section 22(b) the following items shall not be included in gross income and shall be exempt from taxation under this chapter: "(a) Earned Income From Sources Without The United States. - "(1) Foreign resident for entire taxable year. - In the case of an individual citizen of the United States, who establishes to the satisfaction of the Commissioner that he is a bona fide resident of a foreign country or countries during the entire taxable year, amounts received from sources without the United States * * *." While it is true that petitioner was actually in Russia during the entire taxable year, the statute requires more. Exemption depends not upon whether he was physically present in Russia, but upon whether he was a "bona fide resident" of that country during that year. Prior to the 1942 Act, Section 116(a) of the Code permitted foreign income to be tax-free where the taxpayer was merely a "bona fide non-resident" of the United States for more than six months of the taxable year. The purpose *49 of the 1942 amendment was to narrow the exemption. Indeed, when the 1942 legislation was pending in the House of Representatives the exemption was completely eliminated (H.R. 7378, 77th Cong., 2d Sess., Sec. 134(a); H. Rep. No. 2333, 77th Cong., 2d Sess., p. 93), but it was restored in restricted form by the Senate. The purpose of the provision was explained by Senator George, the Chairman of the Senate Finance Committee, as follows (Hearings before Senate Finance Committee on H.R. 7378, 77th Cong., 2d Sess., Vol. 1, p. 743): "* * * I think it is recognized that the complete elimination of section 116 (a) was not really intended, that it was not the primary purpose in the case of the bona fide, nonresident American citizen who established a home and maintains his establishment and is taking on corresponding obligations of the home in any foreign country, but there is some need for treatment of this section, so that the technicians, American citizens who are merely temporarily away from home could be properly reached and properly dealt with for taxation purposes." See also S. Rep. No. 1631, 77th Cong., 2d Sess., pp. 54-55, 116. In determining whether a citizen of the United States *50 is a "bona fide resident" of a foreign country, the Treasury Regulations provide that the same principles shall be employed as are applicable to the cognate problem of determining whether an alien individual is a resident of the United States. Regulations 111, Section 29.116-1. [1] The pertinent criteria are set forth in Section 29.211-2 of the same regulations, and are reproduced in the margin. [2]
*51 The issue here presented is not a new one. It has been raised in a number of cases of American citizens who were absent from this country in connection with the war effort. Thus, in Michael Downs, 7 T.C. 1053, a Lockheed employee who worked at various air bases in England and Northern Ireland for several years during World War II was held not to be a "bona fide resident" of any foreign country. The same conclusion was reached in J. Gerber Hoofnel, 7 T.C. 1136, and the decisions in both cases were affirmed by the Court of Appeals for the Ninth Circuit in a single opinion. Downs v. Commissioner, 166 Fed. (2d) 504, certiorari denied, 334 U.S. 832. Similar results were reached in a variety of other situations. Arthur J. H. Johnson, 7 T.C. 1040; Ralph Love, 8 T.C. 400; Dudley A. Chapin, 9 T.C. 142; William B. Cruise, 12 T.C. 1059; Carl H. Thorsell, 13 T.C. 909. We think a like result is called for here. Since controversies of this type depend in large part upon the particular facts involved, it is to be expected that there may be some close cases falling on each side *52 of the line. We think that the cases relied upon by petitioner (e.g., Swenson v. Thomas, 164 Fed. (2d) 783 (C.A. 5); John Henry Chapman, 9 T.C. 619) are largely of such character. While it may be difficult to point to any single fact in any such case that differentiates it, nevertheless in each of them, there was a stronger showing that the taxpayer had made his home in the country involved, identifying himself in some degree with the customs and activites of that country. Thus, in the Swenson case, an American citizen spent four years in Colombia as a geophysicist for an American company, and paid income taxes in Colombia. Although the latter fact, standing alone, may not be crucial, it is nevertheless a relevant consideration, for Senator George in explaining the purpose of Section 116(a) spoke of the establishment of a home and "taking on corresponding obligations of the home" in the foreign country. In the Chapman case, an alien came to the United States as an official of the League of Nations to do accounting and statistical work for an indefinite period. He lived here continuously from 1940 through 1944 and thereafter. He and his family occupied a rented *53 apartment in Princeton, New Jersey, and he purchased the furnishings. They had no other residence. A good example of a case clearly falling within Section 116(a) and the regulations is Herman Frederick Baehre, 15 T.C. No. 36 (promulgated September 20, 1950), where the taxpayer, an American, went to Canada in connection with employment under a war contract. He was joined shortly by his wife and two children, who brought all of his possessions, including furniture and automobile. They lived together in Canada for more than two years, intending to remain for an indefinite period, and participated in community activities. The regulations quoted in footnote 2, supra, contemplate that there be at least a temporary home with some degree of identification with the life in the new country. That concept is reflected in the language that refers to a taxpayer whose purpose necessitates an extended stay and to that end "makes his home" temporarily on foreign soil. Such was the situation in the Baehre case, but the facts of the present case bring it more closely within the ambit of the decisions typified by the Downs case. The petitioner herein did not "make his home" in Russia within *54 the meaning of these provisions. Petitioner was sent to Russia to perform technical services of a supervisory nature in connection with a war emergency project involving the construction of certain oil refineries. When he departed for Russia he left his wife and daughter in the United States in a home that he purchased for them to occupy during his absence. His contract of employment provided that the company would furnish transportation back to the United States and to his home upon completion of his services abroad. His intention was to remain in Russia only as long as was required to complete his work and he had no intention of becoming a permanent resident of that country. During the year 1944 he lived in a hotel in Moscow, which was operated by Intourist, an agency of the Soviet government concerned primarily with tourists and traveling people. His intention to return to the United States was fixed and definite except as to time. His contract of employment provided that it could be terminated at any time without cause and without notice by the company, and it was made subject to the provisions of the agreement between the U.S.S.R. and the United States under which he could be *55 returned to the United States at any time at the request of the company, the United States, or the U.S.S.R. As an engineer assigned to the Russian project he was attached to the United States Supply Mission in the U.S.S.R. which was authorized to represent the engineers and technicians employed on the project before the responsible individuals and agencies of the U.S.S.R. Proper credentials were provided by the civilian and military authorities of the U.S.S.R. permitting petitioner's presence in that country, travel in performance of his duties, and departure from the U.S.S.R. He was accorded special privileges, such as listening to short wave broadcasts and reading any magazines and literature in which he was interested. His participation in the community social life was largely confined to going to parties in connection with the project on which he was working. Upon the completion of his work in Russia, he returned to his home in Farmington, Michigan. The facts in this case convince us that during the taxable year the petitioner was not a "bona fide resident" of Russia. He differed in no pivotal respect from the technicians and other employees of corporations involved in the cases *56 cited by respondent, who went abroad to perform services in connection with the war effort. The respondent correctly determined that the income realized by him in 1944, while employed in Russia, is not exempt from taxation under the provisions of section 116(a)(1), supra. In accordance with the supplemental stipulation filed by the parties, Decision will be entered that there is a deficiency in income tax for the year 1944 in the amount of $9,405.30. Footnotes
1. REGULATIONS 111. Sec. 29.116-1. * * * Whether the individual citizen of the United States is a bona fide resident of a foreign country shall be determined in general by the application of the principles of sections 29.211-2, 29.211-3, 29.211-4, and 29.211-5 relating to what constitutes residence or nonresidence, as the case may be, in the United States in the case of an alien individual. ↩
2. Sec. 29.211-2. Definition. - A "nonresident alien individual" means an individual - (a) Whose residence is not within the United States; and (b) Who is not a citizen of the United States. The term includes a nonresident alien fiduciary. An alien actually present in the United States who is not a mere transient or sojourner is a resident of the United States for purposes of the income tax. Whether he is a transient is determined by his intentions with regard to the length and nature of his stay. A mere floating intention, indefinite as to time, to return to another country is not sufficient to constitute him a transient. If he lives in the United States and has no definite intention as to his stay, he is a resident. One who comes to the United States for a definite purpose which in its nature may be promptly accomplished is a transient; but if his purpose is of such a nature that an extended stay may be necessary for its accomplishment, and to that end the alien makes his home temporarily in the United States, he becomes a resident, though it may be his intention at all times to return to his domicile abroad when the purpose for which he came has been consummated or abandoned. An alien whose stay in the United States is limited to a definite period by the immigration laws is not a resident of the United States within the meaning of this section, in the absence of exceptional circumstances.↩